1  Jeff D. Friedman (173886)
   Shana E. Scarlett (217895)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   715 Hearst Avenue, Suite 202
3  Berkeley, CA 94710
   Telephone: (510) 725-3000
4  Facsimile:  (510) 725-3001
   jeff f@hbsslaw.com
5  shanas@hbsslaw.com

6  Steve W. Berman
   HAGENS BERMAN SOBOL SHAPIRO LLP
7  1918 Eighth Avenue, Suite 3300
   Seattle, WA  98101
8  Telephone:  (206) 623-7292
   Facsimile:   (206) 623-0594
9  steve@hbsslaw.com

10  Mark Robinson (054426)
    ROBINSON CALCAGINE, INC.
11  19 Corporate Plaza Drive
    Newport Beach, California 92660
12  Telephone: (949) 720-1288
    Facsimile: (949) 720-1292
13
    *Attorneys for Plaintiff*
14

15                    UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17  THOMAS MCMAHON, Individually and on        No.
    Behalf of All Others Similarly Situated
18                                             CLASS ACTION COMPLAINT FOR
                                 Plaintiff,    VIOLATIONS OF ANTITRUST LAWS,
19                                             STATE UNFAIR COMPETITION
                                               LAWS, AND THE COMMON LAW OF
20       v.                                    UNJUST ENRICHMENT

21  QUALCOMM INCORPORATED,

22                                Defendant.   **JURY TRIAL DEMANDED**

23

24

25

26

27

28

010669-11 931182 V1

# TABLE OF CONTENTS

Page(s)

I.      NATURE OF THE ACTION ................................................................................1

II.     PARTIES ............................................................................................................5

        A.      Plaintiff ...................................................................................................5

        B.      Defendant ................................................................................................5

III.    JURISDICTION AND VENUE ..........................................................................6

IV.     INTRADISTRICT ASSIGNMENT .....................................................................6

V.      FACTUAL BACKGROUND ...............................................................................6

        A.      Shared Technical Standards Are Necessary in Order for Wireless Networks to Operate .................................................................................6

        B.      Development of Wireless Technology ......................................................9

        C.      Baseband Processors Are an Essential Component of Modern Devices that Allow Communication Between Devices and Cellular Networks ..........................10

        D.      Qualcomm's Corporate Structure..........................................................10

VI.     QUALCOMM'S ANTICOMPETITIVE PRACTICES .......................................11

        A.      Qualcomm Has Monopoly Power Over the CDMA and LTE Baseband Processor Markets ................................................................11

        B.      Qualcomm Has Repeatedly Engaged in Various Anticompetitive Practices to Prevent the Development of Competition in the Market for Baseband Processors ..13

                1.      Qualcomm Has Refused to License SEPs to Other Baseband Processor Manufacturers Despite Its Commitment to License SEPs on FRAND Terms ....................................................................13

                2.      Qualcomm Entered Into Various Exclusive Dealing Arrangements with Apple, Including the Sale of Baseband Processors Below Its Cost of Manufacture, in Order to Prevent Competition in the Baseband Processor Market....................................................................16

        C.      Qualcomm's Anticompetitive Practices Have Successfully Reduced Competition in the Baseband Processor Market .....................................17

        D.      Qualcomm's Anticompetitive Licensing Practices Inflate the Patent Royalties that It Collects Above Competitive Rates ................................18

        E.      Qualcomm's Current "No Chips No License" Policy Is a Continuation of Its Longstanding Efforts to Extract Anticompetitive Royalties on Its SEPs.................21

|   |   |   |
|---|---|---|
| F. | Qualcomm Exploits Its Monopoly Power Over the Supply of CDMA and LTE Baseband Processors Through Artificial Supply Constraints that Force OEMS to Pay Qualcomm's Artificially Inflated Royalty Rates | 24 |
| G. | Qualcomm Has Resisted Efforts to Split QCT and QTL Because It Would Prevent Qualcomm From Continuing Its Anticompetitive Practices | 25 |
| H. | Governments Have Repeatedly Penalized Qualcomm for Its Anticompetitive Practices | 26 |
| I. | Market Definition | 28 |
| VII. | EFFECTS OF QUALCOMM'S MISCONDUCT | 29 |
| A. | The Inflated Prices for Qualcomm's SEPs and Baseband Processors Were Passed on to Consumers | 29 |
| VIII. | CLASS ACTION ALLEGATIONS | 31 |
| IX. | CLAIMS FOR RELIEF | 34 |
| X. | DEMAND FOR TRIAL BY JURY | 42 |
| XI. | PRAYER FOR RELIEF | 42 |

1   Plaintiff brings this action against defendant Qualcomm Incorporated ("Qualcomm") on

2   behalf of himself and all others similarly situated for a consistent pattern of anticompetitive conduct

3   that inflated the prices that plaintiff paid for cell phones and tablets.

4   **I.     NATURE OF THE ACTION**

5   1.     Qualcomm holds a monopolistic position in the market for several types of broadband

6   processors, an essential component of cell phones and tablets.  Qualcomm's product market share

7   has consistently been over 80% for two different types of baseband processors.  Qualcomm has

8   maintained its broadband processor monopoly through anticompetitive practices that eliminate and

9   reduce competition by driving competitors out of this market and limiting new entry.  Qualcomm

10  uses its monopoly position to charge supracompetitive prices for both its baseband processors and

11  associated intellectual property from cell phone and tablet manufacturers.  These market-wide

12  overcharges increase the entire cost structure and are passed onto consumers in the form of higher

13  prices on cellular devices.

14  2.     The components of a wireless network all use a shared communication standard in

15  order to ensure compatibility. Companies in the wireless industry form standard setting organizations

16  ("SSO") that develop these standards. Participants in the SSOs own various patented technologies

17  that are included in the operation of the standard. These patents are known as standard essential

18  patents ("SEP") because they must be licensed by companies that make products or services that use

19  the standard – in short, firms need licenses in order to produce the products in these markets.

20  3.     Companies sink tremendous costs into developing products and services based upon a

21  standard. These industry-wide investments produce a "lock in effect" because companies must use

22  the agreed-upon standard in order to sell products and services that are competitive in the market.

23  SEP owners could demand inflated royalties that include a premium for this lock in effect.  A royalty

24  rate that included this premium would be supracompetitive because it would exceed the royalty rate

25  that a licensee would pay if the lock in effect did not exist. SSOs are keenly aware of this problem,

26  which, if abused, could limit competition, consumer choice, and innovation. Therefore SSOs require

27  participants to agree to license their potential SEPs on fair, reasonable, and non-discriminatory terms

28  ("FRAND") as a condition of the inclusion of this patented technology into the standard. By

CLASS ACTION COMPLAINT
Case No.:                                    -1-
010669-11 931182 V1

1   definition, a FRAND rate is equivalent to the competitive royalty rate that would be negotiated

2   between licensor and licensee and excludes the supracompetitive premium that an SEP licensor

3   could otherwise charge.

4         4.     An SSO will generally design a standard to avoid using patents whose owners refuse

5   to agree to license them on FRAND terms.

6         5.     Wireless communications have gone through 4 generations of wireless standards –

7   referred to as 1G, 2G, 3G, and 4G. There are 2 main types of 2G and 3G standards – CDMA and

8   GSM/UMTS that are based on different types of technology. LTE is the main 4G standard.

9   Qualcomm holds a number of SEPs related to CDMA technology and made written contractual

10  commitments to offer those SEPs on FRAND terms to all licensees.

11        6.     Baseband processors are an essential component of cellular devices that enable cell

12  phones and tablets to communicate with wireless networks. Baseband processors are designed to

13  work with specific wireless standards. Since 2001, Qualcomm has had a monopoly in the CDMA

14  baseband processor market, with consistent market shares above 90%. Since 2012, Qualcomm has

15  also held a monopoly in the LTE baseband processor market with market shares above 90% from

16  2012 to 2014. In 2015, Qualcomm had an 83% share of the CDMA baseband processor market and a

17  69% share of the LTE baseband processor market.

18        7.     Since at least 2008, Qualcomm has maintained its monopoly over these products with

19  anticompetitive practices by flatly refusing to license its SEPs on FRAND terms to other baseband

20  processor manufacturers. Qualcomm's anticompetitive refusal to deal violated its contractual

21  commitment to offer its SEPs on FRAND terms to all licensees. According to the Korean Fair Trade

22  Commission ("KFTC"), Qualcomm's own internal documents show that its licensing practices were

23  explicitly designed to drive competitor manufacturers out of the market.

24        8.     Qualcomm's anticompetitive practices have allowed it to successfully maintain a

25  monopolistic position in the CDMA and LTE baseband processor markets. Since 2008, nine of the

26  other 11 baseband processor manufacturers have exited the market even as it has more than doubled

27  in size. Qualcomm is able to charge inflated prices for CDMA and LTE baseband processors because

28  of its monopoly and those overcharges are passed onto consumers.

CLASS ACTION COMPLAINT
Case No.:
010669-11 931182 V1

9.      Qualcomm's illegally maintained monopoly over the CDMA and LTE baseband processor markets allowed it to collect inflated, excessive royalties on its SEPs from cell phone and tablet manufacturers (OEMs). To this end, Qualcomm has established an anticompetitive "no chips no license" policy that requires OEMs to separately pay an artificially inflated royalty rate for Qualcomm's SEPs as a condition of purchasing Qualcomm's baseband processors. Qualcomm refuses to sell baseband processors to OEMs who will not pay Qualcomm's inflated royalty rates. And Qualcomm has used the threat of a reduced supply of baseband processors to ensure that OEMs continue to pay Qualcomm's artificially inflated royalty rates on its SEPs.

10.      Qualcomm's "no chips no license" policy is unique. Every other cell phone component manufacturer includes a license to their intellectual property rights with the sale of the component. Qualcomm's practice also violates the established legal doctrine of patent exhaustion, which holds that the authorized sale of an article by a patent owner that substantially embodies the patent holder's patents exhausts the patent holder's rights in the article.

11.      Qualcomm's anticompetitive practices have allowed it to collect supracompetitive royalties from OEMs. Apple stated that it pays Qualcomm more patent royalties than it pays to *all* other patent holders on sales of its cellular devices even though those patent holders have far more intellectual property related to Apple's products. One study found that Qualcomm received royalties equivalent to 2% of global cell phone sales in 2013 and 2014, while four other comparable companies, each with similar portfolios of SEPs, only received between .2 to .4% of overall cell phone sales. Qualcomm currently demands a royalty rate of 3.25% on the wholesale price of LTE cell phones and tablets, even though the LTE standard is not based on Qualcomm's CDMA technology.

12.      Qualcomm demands and receives royalties on product features that are unrelated to its patents by abusing its monopoly.  Qualcomm's royalty rate is calculated based on the final wholesale price of a cell phone or tablet even though the final wholesale price is often dependent on completely unrelated features.  Apple sells the iPhone 7 at several different price points based on the amount of memory that the device has. This is the only difference between the various models.  Qualcomm, however, receives more royalty revenue from the more expensive versions of the iPhone 7, even

though its technology has nothing to do with the extra features that justify the higher retail price. Qualcomm's anticompetitive licensing practices disincentivize OEMs from including technical features that would benefit consumers. This is a form of overcharge on consumers who are deprived of valuable technical features in cell phones and tablets that would have been included but for Qualcomm's supracompetitive patent royalties.

13.     Qualcomm's "no chips no license" policy chills OEMs from seeking a judicial determination of an appropriate FRAND rate on Qualcomm's SEPs because they cannot risk losing access to Qualcomm's baseband processors.  Judicial review of this contractual commitment is a necessary check on unreasonable demands – it ensures that a competitive rate will be judicially set if a SEP owner refuses to offer FRAND terms. Qualcomm even includes contractual provisions that prevent OEM licensees from seeking a judicial determination of the FRAND rate.

14.     Across the world, government antitrust agencies have so far levied over $2 billion in fines on Qualcomm for its anticompetitive practices and multiple investigations are still pending.

15.     The Korean Fair Trade Commission fined Qualcomm $208 million in 2009 and $853 million in 2016 for Qualcomm's unfair licensing practices.   The Chinese National Development & Reform Commission ("NDRC") fined Qualcomm $975 million in 2015 for its licensing practices and required Qualcomm to change the licensing terms that it offered for its SEPs. The Japanese Fair Trade Commission issued a cease and desist order against Qualcomm in 2009 for violating its FRAND obligations. The Taiwanese Fair Trade Commission announced an ongoing investigation into Qualcomm's licensing practices in December 2015.

16.     In December 2015, the European Commission announced two statements of objection against Qualcomm for 1) paying Apple significant amounts to exclusively purchase baseband chipsets from Qualcomm, stifling competition in the market; and 2) pricing baseband processors below cost in order to hinder competition in the market.

17.     On January 17, 2017, the Federal Trade Commission filed a complaint against Qualcomm for its licensing practices in this Court. *Federal Trade Commission v. Qualcomm Inc.*, Case No. 17-cv-00220 (N.D. Cal. Jan. 17, 2017). The FTC stated that Qualcomm had unlawfully

1  maintained a monopoly in baseband processors and that Qualcomm's actions had "raise[d] prices

2  paid by consumers for cell phones and tablets."

3        18.     Qualcomm has actively worked to foil these government investigations. Qualcomm

4  withheld approximately $1 billion in rebate payments from Apple as retaliation for Apple's

5  cooperation with the 2016 KFTC investigation. Qualcomm offered to release these payments only if

6  Apple submitted revised materials to the KFTC that asserted Qualcomm's position.

7        19.     Broadcom, Nokia, and Icera have each previously filed antitrust lawsuits against

8  Qualcomm for its anticompetitive practices. Last week, Apple filed an antitrust action against

9  Qualcomm in the Southern District of California because of Qualcomm's anticompetitive practices.

10  *Apple v. Qualcomm Incorporated*, Case No. 17-cv-00108 (N.D. Cal. Jan. 20, 2017).

11        20.     Plaintiff brings this action on behalf of himself and others similarly situated to recover

12  for their injuries resulting from Qualcomm's violations of Sections 1 and 2 of the Sherman Act, as

13  well as violations of state antitrust and consumer protection laws. Plaintiff seeks monetary damages,

14  injunctive relief, and any other available remedies to which they are entitled for Qualcomm's

15  unlawful conduct.

16                        **II.     PARTIES**

17  **A.     Plaintiff**

18        21.     Plaintiff  Thomas McMahon ("McMahon") is a resident of California.  McMahon

19  purchased a iPhone 6 for personal use and not for resale.

20  **B.     Defendant**

21        22.     Defendant Qualcomm Incorporated ("Qualcomm") is a Delaware corporation having

22  its principal place of business at 5775 Morehouse Drive, San Diego, California 92121. Qualcomm

23  develops, designs, licenses, and sells digital communication products. Qualcomm has two main

24  segments that are wholly owned subsidiaries: Qualcomm CDMA Technologies ("QCT") and

25  Qualcomm Technology Licensing ("QTL"). QCT manufactures and sells cellular phone components,

26  primarily baseband processors. QTL licenses the rights to Qualcomm's patent portfolios.

27        23.     Qualcomm has extensive offices in this District, including in San Francisco, Santa

28  Clara, and Alameda counties. Many Qualcomm licensees, such as Apple, are located in this District.

### III.   JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.

25.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to plaintiff's claims occurred in this District, and Qualcomm transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here.

### IV.   INTRADISTRICT ASSIGNMENT

26.     Pursuant to the Northern District of California's Civil Local Rule 3-2(c), the intradistrict assignment should be to the San Jose Division.  This action arises in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County. Qualcomm has offices in Santa Clara and San Jose.  Third parties, including various OEMs, have offices in Santa Clara County.  The FTC filed a case in the San Jose Division related to the Qualcomm practices that are at issue here.

### V.   FACTUAL BACKGROUND

**A.      Shared Technical Standards Are Necessary in Order for Wireless Networks to Operate**

27.     A cellular network's various components must each follow a common technical standard that controls how the components communicate with each other. Different companies each provide elements of a wireless network – including cellular service providers, like Verizon, baseband processor manufacturers, like Qualcomm, and wireless device manufacturers, like Apple. To make a wireless network function, Qualcomm, Verizon, and Apple all must agree on a common standard.

28.     Companies that participate in the wireless communications industry have formed standard setting organizations (SSOs) to create and develop these necessary standards. There are several different key SSOs. The International Telecommunications Union ("ITU") is a worldwide telecommunications SSO composed of participants from both governments and private companies.

CLASS ACTION COMPLAINT
Case No.:                                          -6-
010669-11 931182 V1

The Telecommunications Industry Association ("TIA") is the primary U.S. SSO for the communications industry.  TIA is composed of telecommunications companies that either manufacture or supply products and services in this industry. The European Telecommunications Standards Institute ("ETSI") is an independent, non-profit organization based in France that is focused on producing global communication standards.

29.     Companies must design their products based on the standard in order to make competitive products. For example, a cell phone manufacturer must make cell phones that are compatible with a wireless network operator's chosen standard in order to sell phones to that wireless network's customers. Companies invest tremendous resources in designing and manufacturing products based on the standard. Therefore, the creation of a standard produces a "lock in" effect where an industry participant must continue to use a standard once it has been adopted.

30.     Wireless standards are generally based on numerous patents held by many different industry participants. These patents are known as standard essential patents ("SEPs") because industry participants must get a license for all of these patents in order to ensure they can continue to offer products and services based on the standard without risk of infringement.

31.     In antitrust terms, the standard setting process gives SEP owners monopoly power because the declaration of a standard effectively eliminates competition within a technology product market.

32.     There are obvious concerns that an SEP owner may exploit their market power and demand inflated royalties from potential licensees because of the leverage that they gain from the lock-in effect. SEP owners could demand a supracompetitive royalty rate that contained an additional premium from licensees because of the lock-in effect. Licensees would have to pay the supracompetitive royalty premium in order to continue to sell products that used the standard. OEM licensees then pass these overcharges onto consumers.

33.     To prevent this anticompetitive practice, SSOs require that patent owners make a written contractual commitment to license their patents on FRAND terms as a condition of the patent's inclusion into the standard. If a patent holder refuses to make this promise, the SSO will not include the technology in the proposed standard. The FRAND commitment explicitly includes a

requirement that the royalty rate is based on the actual merits of the patented technology, rather than any inflated royalties that could be extracted because of the lock-in effect. The FRAND commitment ensures that licensees do not pay supracompetitive royalty rates.

34.     The FRAND commitment requires that manufacturers non-discriminatorily license their SEPs to competing manufacturers. This requirement ensures that manufacturers will not gain a monopoly over component parts that are used in the standard by simply refusing to license the necessary SEPs to potential competitors. Without this commitment, manufacturers could easily gain monopoly profits from inflated prices on patented components that operate the standard.

35.     The FRAND commitment also addresses a secondary concern. SSOs do not actually check the validity or applicability of each alleged SEP to ensure that it is actually essential to practicing the standard. Instead, they accept the representations of SSO participants that an SEP is actually necessary to practice the standard. The FRAND commitment ensures that licensees can negotiate competitive rates for SEPs that are actually essential to the standard.

36.     The leading wireless SSOs recognize the critical importance of the FRAND commitment. The TIA stated in a submission to the FTC:

> Market driven open standards can help promote competition and innovation, and such standards are developed or ratified through a voluntary, open and consensus based process. This process means a SSO typically includes/has an IPR policy pursuant to which patent holders make commitments to offer licenses to essential patented technology on reasonable and non-discriminatory (RAND) terms and conditions, with or without compensation. This type of IPR policy addresses implementers' need to access and use patented technology included in the standard; at the same time, patent holders preserve their rights in a way that encourages them to innovate and to contribute their innovative solutions to the standardization effort. RAND patent policies seek to provide this balance by helping to make that patented technology available to all on RAND terms and conditions. *RAND commitments can and do prevent IPR holders from making the implementation of a standard difficult by refusing to license or by seeking unreasonable or discriminatory fees after the industry has been locked into the standard.*

37.     Qualcomm belongs to each of the leading SSOs in the wireless communications industry and has made a commitment to license its SEPs on FRAND terms. But Qualcomm has repeatedly broken its contractual promises by engaging in extortionate licensing practices that result in inflated royalty rates.

**B.      Development of Wireless Technology**

38.      ETSI, TIA, ITU and other SSOs have developed four generations of cellular communication standards. The first standard, introduced in the 1980s, only allowed for analog transmission of voice calls and very low amounts of data.

39.      The second generation (2G) of standards was first introduced in the early 1990s to enable digital transmissions of data. Two main standards were developed: (1) the Global System for Mobile communications ("GSM"); (2) Code Division Multiple Access ("2G-CDMA"). Qualcomm's SEPs constituted a very significant portion of the overall set of SEPS for 2G-CDMA. Cellular networks were designed around one of the two standards.  AT&T and T-Mobile chose the GSM standard while Verizon and Sprint chose the 2G-CDMA standard.

40.      The third generation (3G) of standards were introduced in the late 1990s.  Two main standards were again developed: (1) the Universal Mobile Telecommunications System; (2) third-generation CDMA ("3G-CDMA").  3G-CDMA heavily relied on 2G-CDMA technology.  The UMTS system also incorporated CDMA technology by using "wideband code division multiple access" ("WCDMA") technology. GSM network operators transitioned to the UMTS standard while 2G-CDMA operators transitioned to the 3G-CDMA standard. Qualcomm had a smaller share of SEPs related to the UMTS and 3G-CDMA standards than its share of the 2G-CDMA SEPs.

41.      The fourth generation (4G) of standards were first introduced in 2009. 4G standards allow for substantially higher data-transmission speeds than 3G standards. Most major network operators have chosen the Long-Term-Evolution ("LTE") standard. The LTE standard does not rely on CDMA-based technology. Thus, Qualcomm's share of SEPs related to the LTE standard is much lower than its share of standards based on CDMA technology. Qualcomm holds a share of SEPs for the LTE standard that is roughly equivalent to that of other industry competitors. One study of declared LTE SEPs found that Qualcomm had a 13% share of "highly novel" essential LTE patents, compared to 19% for Nokia and 12% for both Ericsson and Samsung.

42.      Qualcomm committed to ETSI, TIA, ATIS and other SSOs that it would license its cellular SEPs for the 2G, 3G, and 4G technologies on FRAND terms.

**C.     Baseband Processors Are an Essential Component of Modern Devices that Allow Communication Between Devices and Cellular Networks**

43.     Cell phones and tablets contain a semiconductor device known as a baseband processor. This device is sometimes also referred to as a chipset or modem.  Baseband processors manage the radio control functions of cellular devices, including signal generation, modulation, encoding, and frequency shifting.

44.     A baseband processor performs the essential function of allowing cell phones and tablets to communicate with a wireless network. A baseband processor must comply with the communications standard that a wireless network uses in order to provide functionality. For example, a baseband processor that complied only with the 3G-CDMA standard could not communicate with a wireless network that used the UMTS standard.

45.     Baseband processors that comply with multiple standards are known as "multi-mode" processors. Multi-mode processors can communicate with networks that use multiple standards or multiple networks that use different standards.

46.     The major U.S. cellular network operators have each deployed the 4G LTE standard on their networks. These network operators, however, have also continued to use the prior standards. This is because the new LTE infrastructure is primarily designed to handle data traffic while the 2G and 3G legacy infrastructure remains dedicated to voice calls. In addition, network operators have, in many areas, not yet replaced their 2G and 3G infrastructure with the new 4G infrastructure.

47.      U.S. wireless network operators require that devices currently sold for use on their network be backwardly compatible with the 2G and 3G standards used on that specific network. Therefore, OEMs must purchase multimode baseband processors to produce cellular devices that can function on the major U.S. wireless networks.

**D.     Qualcomm's Corporate Structure**

48.     Qualcomm has two primary divisions: Qualcomm CDMA technologies ("QCT") and Qualcomm Technology Licensing ("QTL").

49.     QCT manufactures Qualcomm's integrated circuit products, primarily baseband processors.  QCT produces a variety of different baseband processors, including processors that are

compliant with the 2G-CDMA, 3G-CDMA, UMTS, and LTE standards. QCT also manufactures multi-mode processors that are compliant with multiple standards.

50.     QTL is responsible for licensing thousands of patents that Qualcomm has declared as essential to the 3G-CDMA, UMTS, and LTE standards. QTL holds a monopoly in the licensing markets for these standards because an OEM must license all SEPs for these standards in order to manufacture devices without fear of infringement.

51.     QCT generates most of Qualcomm's revenue but QTL is responsible for the vast majority of Qualcomm's profits. For example, in 2015, QCT generated $17.15 billion in revenue while QTL generated $7.95 billion. Between 2013 to 2015, QCT was consistently responsible for approximately 70% of Qualcomm's revenues while QTL collected the remaining 30%.  But Qualcomm gained the vast majority of its profits from QTL:  in 2015, QTL generated $6.88 billion in earnings before taxes versus $2.46 billion for QCT.

## VI.     QUALCOMM'S ANTICOMPETITIVE PRACTICES

### A.     Qualcomm Has Monopoly Power Over the CDMA and LTE Baseband Processor Markets

52.     Qualcomm holds a monopoly position in the CDMA baseband processor market. Between 2001 to 2014, Qualcomm held over a 90% share of the CDMA baseband processor market. Qualcomm had a market share over 80% of this market in 2015. Qualcomm's anticompetitive practices, discussed below, have prevented the attempts of competitors such as Intel, Texas Instruments, and Eonex to enter this market.

53.     For the last decade, Qualcomm's only main competitor for the supply of single mode CDMA processors was Via Technologies, which manufactured processors that were only compliant with either the 2G-CDMA or 3G-CDMA standards. Via Technologies did not manufacture multi-mode CDMA processors that would work with the UMTS or LTE standards. In 2015, Intel acquired Via Technologies but Intel has not yet released a multi-mode processor that uses Via's CDMA technology.

54.     OEMs need CDMA processors in order to produce cellular devices that can operate on either the Verizon or Sprint networks.

55.     Qualcomm charges monopoly prices to OEMs who need to purchase CDMA baseband processors. Qualcomm has charged OEMs, such as Apple, an inflated premium for baseband processors with CDMA functionality enabled versus other technically identical baseband processors without that functionality.

56.     Qualcomm also has a monopoly position in the LTE baseband processor market. OEMs seeking to manufacture and sell high-end smart phones, such as the iPhone or Samsung Galaxy, need a supply of these baseband processors. Between 2012 to 2014, Qualcomm had over 80% of this market. Qualcomm had a 69% share of this market in 2015. Currently, Qualcomm's only competitor in the LTE baseband processor market is Intel. Qualcomm is also the only manufacturer of LTE baseband processors that also include CDMA functionality. This type of baseband processor is necessary for OEMs who need this type of baseband processor in order to manufacture cell phones and tablets that can work on the Verizon and Sprint networks.

57.     Both the CDMA and LTE baseband processor markets are protected by very high barriers to entry. These barriers include (a) the required investment of hundreds of millions of dollars in R&D; (b) intellectual property licensing requirements; (c) the scale necessary to achieve cost efficiencies that make products competitive; and (d) Qualcomm's own exclusionary conduct.

58.     The KFTC estimated that Qualcomm had the following market shares in each of the main baseband processor markets:

<Qualcomm's Market Share Trend in Modem Chipset Market per Standard (Based on Revenues)>

|       | Yr 2008 | Yr 2009 | Yr 2010 | Yr 2011 | Yr 2012 | Yr 2013 | Yr 2014 | Yr 2015 |
|-------|---------|---------|---------|---------|---------|---------|---------|---------|
| LTE   | -       | -       | 34.2%   | 58.8%   | 94.5%   | 96.0%   | 84.8%   | 69.4%   |
| CDMA  | 98.4%   | 97.6%   | 96.4%   | 94.3%   | 92.4%   | 93.1%   | 91.6%   | 83.1%   |
| WCDMA | 38.8%   | 47.4%   | 45.7%   | 55.0%   | 50.4%   | 53.9%   | 48.8%   | 32.3%   |

* Source: Strategy Analytics

59.     Qualcomm's continued maintenance of a monopoly in the CDMA and LTE baseband processor markets is a result of its anticompetitive practices that have driven competitors out of the market and prevented new entrants.

**B.     Qualcomm Has Repeatedly Engaged in Various Anticompetitive Practices to Prevent the Development of Competition in the Market for Baseband Processors**

       **1.     Qualcomm Has Refused to License SEPs to Other Baseband Processor Manufacturers Despite Its Commitment to License SEPs on FRAND Terms**

60.     Qualcomm has maintained its monopoly over CDMA and LTE baseband processors by refusing to offer its associated SEPs on FRAND terms to competing manufacturers. Qualcomm itself has acknowledged in a litigation filing that its FRAND Commitments "ensure[] that all industry participants will be able to develop, manufacture and sell products compliant with the relevant standard without incurring the risk that patent holders will be able to shut down those operations."

61.     But Qualcomm's actions do not match its words. From 1999 to 2007, Qualcomm only offered its SEPs to other baseband processor manufacturers on non-FRAND terms. Since 2008, Qualcomm has simply refused to offer *any* licenses to potential competitor manufacturers despite requests from Intel and Samsung for FRAND licenses.

62.     During the development of the 3G UMTS standard, Qualcomm made written commitments to ETSI, as well as other SSOs, that it would offer all of its SEPs on FRAND terms. Although the first version of the UMTS standard was released in December 1999, Qualcomm only disclosed its SEPs in October 19, 2001, ensuring that the UMTS standard could not be designed around Qualcomm's SEPs.

63.     But Qualcomm, then refused to offer its SEPs on FRAND terms to other baseband processor manufacturers.

64.     In April 2006, Broadcom introduced a UMTS baseband processor onto the market. Qualcomm asserted to Broadcom and Broadcom's customers that Broadcom did not have a license to Qualcomm's SEPs that were related to the UMTS standard. Broadcom attempted to negotiate a license with Qualcomm for its SEP patents for the UMTS standard.

65.     Qualcomm proposed non-FRAND terms to Broadcom and other UMTS chipset manufacturers that prevented them from effectively competing. Qualcomm proposed licensing agreements that ensured a double tax was imposed on OEMs that used non-Qualcomm UMTS chipsets. Qualcomm assessed royalty rates on OEM device manufacturers that included the value of UMTS baseband processors in the overall device unit price even if those chipsets were not

1   manufactured by Qualcomm. At the same time, Qualcomm received UMTS SEP royalties from

2   UMTS baseband processor manufacturers. Qualcomm also demanded that its UMTS baseband

3   processor manufacturer licensees not sell UMTS baseband processors to OEM device manufacturers

4   that had not licensed Qualcomm's UMTS SEPs. Therefore, Qualcomm ensured that it would receive

5   double royalties from both the OEM and the baseband processor manufacturer on sales of non-

6   Qualcomm UMTS baseband processors. By contrast, Qualcomm allowed OEM device

7   manufacturers to deduct the cost of a Qualcomm-manufactured UMTS chipset from the device unit

8   price. These licensing practices violate Qualcomm's commitment to offer its SEPs on fair,

9   reasonable, and *non-discriminatory* terms.

10          66.     Qualcomm also retaliated against competitors that challenged its antitrust practices by

11   filing patent infringement lawsuits. In July 2005, Qualcomm filed a patent infringement action

12   against Broadcom ten days after Broadcom had filed an antitrust action against Qualcomm. In

13   November 2005, Qualcomm filed a patent infringement action against Nokia one week after Nokia

14   filed an antitrust complaint against Qualcomm with the European Commission. On November 11,

15   2005, Qualcomm's general counsel, Lou Lupin, stated that "we do not have any plans, nor does it

16   seem likely, that we will lodge any similar complaints against other manufacturers" and "we have

17   followed up on Nokia and Broadcom only because we have other disagreements with the

18   companies."

19          67.     Nevertheless, Qualcomm, during this period, still at least acknowledged that its

20   FRAND commitments required it to licensee its SEPs to competitors. In 2005, Qualcomm stated to

21   the European Commission that it "never refused to license our essential patent to any company to

22   supply chips, devices, infrastructure or test equipment."

23          68.     In 2007, Qualcomm claimed publicly that competing manufacturers of

24   CDMA and UMTS/WCDMA chipsets "have to take out a license from Qualcomm" and that

25   Qualcomm had been "pretty consistent in that model." Again in 2007, Qualcomm represented to the

26   United States Supreme Court that it had granted worldwide licenses to competitor manufacturers

27

28

with a running royalty calculated as a percentage of the selling price of the baseband processor.[1] In the same filing, Qualcomm identified its practice of "licensing its intellectual property to entities that produce (non-Qualcomm) chips" as one of its three "primary sources of revenue," thereby acknowledging the feasibility and efficiency of licensing at the component level.[2]

69.     Around 2007, Qualcomm began eliminating attempts by other baseband processor manufacturers to license Qualcomm's SEPs. In 2006, Qualcomm's 10-K stated that it entered into "License Agreements" with competing chipset manufacturers, and received royalties thereunder. In Qualcomm's 2007 10-K, the term "License Agreements" was replaced by "Agreements." Qualcomm's 2008 10-K provided that in "every case, these agreements do not allow such integrated circuit suppliers to pass through rights under Qualcomm's patents to such suppliers' customers, and such customers' sales of CDMA-based wireless subscriber devices into which such suppliers' integrated circuits are incorporated are subject to the payment of royalties to us in accordance with the customers' separate licensing arrangements with us."  Qualcomm's 2014 10-K stated that Qualcomm's policy was to enter into "arrangements," but not exhaustive licenses, with competing chipset manufacturers.

70.     The KFTC has stated that Samsung, Intel, and Via, each a manufacturer of baseband processor manufacturer, have requested SEP licenses from Qualcomm but have been flatly refused.

71.     Unlike OEMs, Qualcomm cannot threaten competitor baseband processors with a loss of supply of baseband processors. So instead, Qualcomm simply refuses to deal with its competitors in any meaningful way despite its FRAND commitments and therefore has driven competitors out of the market for CDMA and LTE baseband processors. Qualcomm then charges inflated prices for its CDMA and LTE baseband processors which are passed onto consumers in the form of overcharges.

---

[1] Brief of Qualcomm Inc. as Amicus Curiae Supporting Respondent at 7, *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008) (No. 06-937).

[2] *Id.*

CLASS ACTION COMPLAINT
Case No.:                                                          -15-
010669-11 931182 V1

**2.      Qualcomm Entered Into Various Exclusive Dealing Arrangements with Apple, Including the Sale of Baseband Processors Below Its Cost of Manufacture, in Order to Prevent Competition in the Baseband Processor Market**

72.      Qualcomm maintained its monopolistic control of the CDMA and LTE baseband processor markets by forming exclusive dealing agreements with Apple that prevented competitors from entering the market.

73.      Apple, as a manufacturer of iPhones and iPads, is one of the largest purchasers of baseband processors in the world. Apple employs contract manufacturers that assemble iPhones and iPads. These contract manufacturers pay patent royalties to Qualcomm and those costs are passed on to Apple.

74.      Apple repeatedly engaged in direct negotiations with Qualcomm regarding the excessive royalties that Qualcomm demanded on its SEPs. Qualcomm refused to negotiate SEP royalty rates for licenses directly with Apple but instead gave Apple rebates, discounts, and other incentives to ensure Apple continued to use Qualcomm's baseband processors. Qualcomm also required that Apple's contract manufacturers keep its license agreements with Qualcomm confidential so that Apple could not even determine how much in royalties Qualcomm was charging the contract manufacturers.

75.      In 2007, Qualcomm agreed to give Apple a rebate of all royalties that Qualcomm received from Apple's contract manufacturers over a specified per-unit cap. Apple, in return, agreed not to incorporate the proposed 4G WiMax cellular standard that was advocated by Intel and opposed by Qualcomm. This action helped ensure the adoption of the 4G LTE standard that contained a higher percentage of Qualcomm SEPs.

76.      In 2011, Qualcomm and Apple entered into a new agreement. Qualcomm agreed to make substantial incentive payments to Apple from 2011 to 2016 if Apple agreed to exclusively use Qualcomm baseband processors in all new iPhone and iPad models. Apple would forfeit all of these incentive payments if it used any non-Qualcomm baseband processors.

77.      In 2013, Qualcomm and Apple entered into a modification of the 2011 agreement that extended the exclusivity provisions until 2016. Qualcomm again agreed to rebate royalty payments that it received from Apple's contract manufacturers to Apple above a certain per-device cap.

Qualcomm, however, now insisted on a new condition – Apple could neither initiate nor induce others to initiate litigation that Qualcomm had failed to offer licenses on FRAND terms. Qualcomm also agreed to make separate substantial incentive payments to Apple so long as Apple exclusively sourced baseband processors from Qualcomm. Apple would forfeit both past and future incentive payments if it launched a new device with a non-Qualcomm baseband processor.

78.     Even with rebates, Apple still paid Qualcomm a higher amount in royalties than it collectively paid to other licensors who together owned a far higher percentage of SEPs for the 4G standard.

79.     Qualcomm also used its market power as leverage to require Apple to accept numerous unreasonable contract terms. Qualcomm refused to guarantee Apple a supply of chipsets, arbitrarily limited its liability for failure to supply, and forced Apple to license its own patents to Qualcomm or other Qualcomm licensees.

80.     Apple itself stated in its action filed against Qualcomm last week that "[f]or several years, Qualcomm's actions deterred Apple from switching to Qualcomm's or other potential competitors' chipsets, substantially diminishing competition in the interim."

81.     Qualcomm's ability to demand inflated royalty rates from the largest, most profitable company in the world demonstrate the enormous market power that it possessed.

82.     Qualcomm's exclusive dealing arrangements with Apple were especially damaging to competition in the baseband processor market because Apple is a critical purchaser of baseband processors. Apple sells significant numbers of premium cell phones that require high-end baseband processors. These high-end baseband processors have higher prices and margins that allow baseband processor suppliers to achieve scale and invest additional funds in important R&D efforts.

**C.     Qualcomm's Anticompetitive Practices Have Successfully Reduced Competition in the Baseband Processor Market**

83.     In 2008, Deutsche Bank identified 11 major manufacturers of baseband processors. Since 2009, the baseband processor market has grown in size from approximately $10 billion to over $20 billion in revenue. Yet since 2008, nine of the major chipset manufacturers have exited the market and none have entered. According to the Korean Fair Trade Commission, the Herfindahl-

CLASS ACTION COMPLAINT
Case No.:
010669-11 931182 V1

-17-

Hirschman index for the baseband processor market has increased from 2,224 in 2008 to 4,670 in 2014. The 4G LTE baseband processor market has gone from moderately concentrated to extremely concentrated in that period of time. The KFTC prepared the following chart that demonstrated Qualcomm's incredible success in driving its competitors from the baseband processor market.



<Market Growth Trend in the Modem Chipset Market and Market Exit by Major Chipset Companies>

| Modem Chipset Maker | Exit (Imminent) Time |
|---|---|
| NXP | August 2008 |
| TI | October 2008 |
| Freescale | October 2008 |
| ST Micro | February 2012 |
| NEC | February 2014 |
| Broadcom | June 2014 |
| Ericsson | September 2014 |
| Nvidia | May 2015 |
| Marvell | September 2015 |

**D.    Qualcomm's Anticompetitive Licensing Practices Inflate the Patent Royalties that It Collects Above Competitive Rates**

84.    Qualcomm currently has a "no license-no chips" policy that is designed to extract inflated patent royalties from OEMs in explicit violation of Qualcomm's FRAND commitments. Qualcomm will only sell baseband processors to OEMs who pay a separate royalty rate for Qualcomm's patent portfolio. Qualcomm demands a royalty rate based on the wholesale price of the cellular phone or tablet.

85.    Qualcomm is the only major cell phone component manufacturer that separately sells the component and the associated intellectual property. This is evidence of Qualcomm's unlawful abuse of its monopoly power. By contrast, other cell phone component manufacturers do a single sale of a component that includes the associated IP rights. The OEM can then sell products containing the component without having to pay a separate royalty rate on the overall wholesale price of the device. This approach is consistent with the doctrine of patent exhaustion because the "authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights

and prevents the patent holder from invoking patent law to control postsale use of the article."

*Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 638 (2008).

86.     The royalty rates that Qualcomm extorts from OEMs exceed competitive FRAND-compliant rates in numerous ways:  1) Qualcomm calculates the royalty rate as a percentage of the overall device price, even though cellular devices contain numerous other components, such as cameras and graphics processors;[3] 2) Qualcomm has not adjusted its standard royalty rate even though many of Qualcomm's SEPs have expired; 3) Qualcomm refuses to provide OEMs with a list of the SEPs that it licenses and instead demands that OEMs license Qualcomm's entire portfolio: 4) Qualcomm requires OEMs grant Qualcomm cross-licenses but does not adjust the royalty rate to account for the value of these cross-licenses.

87.     Qualcomm's demand that OEMs license its entire patent portfolio prevents OEMs from determining whether or not specific Qualcomm patents actually need to be licensed – either because the OEM product does not actually infringe or the patent is invalid. Qualcomm has resisted attempts by OEMs to license its specific SEPs on FRAND terms. In 2016, Apple attempted to license the specific patents that Qualcomm considered to be SEPs for the 3G and 4G standards.  Qualcomm refused to negotiate over specific patents and indeed removed from its website the list of patents that it had disclosed to ETSI as SEPs for the 3G and 4G standards.

88.     Qualcomm's demand for a royalty rate based off the entire wholesale price of the phone or tablet is also evidence of its unlawful exercise of monopoly power, when compared to other technology companies whose business model depends on licensing their SEPs. ARM Holdings ("ARMH") holds a large number of SEPs related to the 802.11 wireless standards, which is incorporated into a wide variety of devices that have wireless networking features. But, unlike Qualcomm, ARMH charges a royalty rate based on the price of the specific chips that rely on ARMH's SEPs. For example, Marvell, a chipset manufacturer, uses ARMH's SEPs in wi-fi chipsets

---

[3] *See LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 67 (Fed. Cir. 2012) ("Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product. Thus, it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'").

it produces that are incorporated into Microsoft Xboxes. ARMH charges a 1% royalty rate that is calculated only off of the price of Marvell's chipset, rather than the cost of the overall Xbox product. Qualcomm, by comparison, charges a royalty rate of 3-5% based off the overall wholesale cost of a device, which is usually in the hundreds of dollars, even though its baseband processors sell by themselves for between $10-20. Qualcomm's anticompetitive practice causes overcharges to OEMs (and ultimately consumers) who offer feature-rich phones or tablets at a higher selling price.[4]

89.     Normally, if a SEP licensor and a potential licensee cannot agree on FRAND terms, then either side will initiate litigation that will result in a court determining the FRAND royalty rate. These suits, when litigated to judgment, have produced royalty rates far below the SEP licensor's original demands. For example, Motorola, a SEP licensor, initially demanded that Microsoft pay SEP royalties of $6-$8 for every Xbox sold, but the district court ultimately set the FRAND rate at $.04 per Xbox.[5]  The possibility of judicial intervention ensures a competitive negotiation between licensor and licensee over the exact FRAND rate. Without this judicial check, an SEP licensor can demand supracompetitive royalty rates.

90.     As discussed above, a court would likely determine that a FRAND rate for Qualcomm's SEPs was far below the 3-5% royalty rate that it currently charges on the sale of the entire device. Qualcomm's anticompetitive practices, however, force OEMs to pay inflated rates or else lose access to Qualcomm's CDMA and LTE baseband processors.

91.     Available statistics show the extent to which Qualcomm's anticompetitive practices have inflated royalty rates. For example, Apple's four other largest direct licensors for wireless communication SEPs have each made claims similar to Qualcomm about the strength of their 3G and 4G SEP portfolios. Combined, these four companies have a significantly higher percentage of 4G SEPs than Qualcomm's self-declared 23.5%. But Qualcomm's anticompetitive practices allow it to charge higher royalties to Apple than the other four companies combined.

---

[4] *See In re Innovatio IP Ventures, LLC Patent Litig.*, No. 11 C 9308, 2013 WL 5593609, at *38 (N.D. Ill. Oct. 3, 2013) (A RAND licensor "cannot discriminate between licensees on the basis of their position in the market.").

[5] *Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 WL 2111217, at *99-101 (W.D. Wash. Apr. 25, 2013).

92.     One study found that Qualcomm received approximately 2% of total, worldwide cell phone sales in royalties in 2013, collecting total licensing revenues of approximately $7.8 billion. Four other companies with similar SEP portfolios, Ericsson, Nokia, InterDigital, and Alcatel-Lucent, collected a ***combined*** total royalty rate of only .7% of total cell phone sales and $2.7 billion in revenue. The study likely underestimates Qualcomm's assessed royalty rate because it includes sales of international cell phone manufacturers who do not license Qualcomm's patents.

93.     In 2014, Qualcomm collected royalties equivalent to 1.92% of total cell phone sales and total revenues of $7.8 billion. Four other major licensors collected a combined royalty rate of only .67% of total cell phone sales.

94.     Qualcomm's unlawful exercise of market power, maintained by anticompetitive practices, is also shown by its ability to continue to demand a high percentage royalty rate even though its primary technological contribution, CDMA technology, was not the basis for the 4G standard. Qualcomm previously demanded 5% per wholesale unit for the licensing rights to its 2G and 3G SEPs, based on its patents related to CDMA technology. Many of these patents have likely expired and the LTE standard is not based on CDMA, yet Qualcomm continues to demand a standard 3.25 % royalty rate from licensees for its SEPs related to the 4G standard.

95.     Qualcomm's actions have also had the anticompetitive effect of decreasing innovation. Qualcomm demands cross-licenses from OEM manufacturers for their patent rights as a condition of licensing its SEPs. Qualcomm then includes licenses for those OEM manufacturer patents as a bonus when it licenses SEPs to other competitors. OEM manufacturers therefore have no incentive to invest in R&D because even if they made technological advances, they would have to license those advances for free to Qualcomm, who would then pass those licenses on to others.

96.     The excessive royalty that Qualcomm receives from OEMs is passed through to consumers in the form of inflated prices on OEM devices.

**E.     Qualcomm's Current "No Chips No License" Policy Is a Continuation of Its Longstanding Efforts to Extract Anticompetitive Royalties on Its SEPs**

97.     Qualcomm's current licensing practices are simply a continuation of its long-running pattern of refusing to offer FRAND terms to OEMs. During the 2000s, Qualcomm consistently

CLASS ACTION COMPLAINT
Case No.:
010669-11 931182 V1

-21-

1    demanded a variety of non-FRAND terms from OEMs that sought to license Qualcomm SEPs

2    related to the UMTS standard.

3         98.    Qualcomm publicly stated that it would charge the same royalty rates for its WCDMA

4    SEPs that were incorporated into the UMTS standard as it did for its SEPs on 3G CDMA technology,

5    even though Qualcomm's share of the WCDMA patent pool was much smaller than that of the 3G

6    CDMA pool. Qualcomm's actions show its ability to unilaterally set prices. On May 5, 2005, Steve

7    Altman, the Qualcomm executive in charge of their licensing strategy, stated that Qualcomm's

8    licensees would be required to pay the same royalty rates for Qualcomm's WCDMA patents so long

9    as "one claim of one patent applies." This statement is totally inconsistent with Qualcomm's

10   FRAND obligations.

11        99.    Qualcomm required licensees of its UMTS SEPs at both the component and cell

12   phone levels, meaning that Qualcomm double charged the OEM by including the cost of the UMTS

13   chipset as part of the cost of the cell phone, even though Qualcomm had already received a royalty

14   from the baseband processor manufacturer. The result of this was that the both the device and

15   baseband processor manufacturers paid Qualcomm a royalty for the same right to make the baseband

16   processor

17        100.   Qualcomm required UMTS licensees to grant back to Qualcomm licenses that were

18   broader than what Qualcomm offered, which violated its FRAND obligation to only enter into

19   reciprocal licensing agreements.

20        101.   Qualcomm offered to reduce the patent royalty rates on its UMTS SEPs if OEMs

21   agreed to purchase its baseband processors exclusively from Qualcomm. This royalty rate

22   discrimination is anticompetitive and prevented the development of effective competition in the

23   baseband processor markets.

24        102.   From 2001 to 2006, Qualcomm's patent licensing agreements with Chinese OEMs

25   were dependent on these manufacturers' use of Qualcomm baseband processors. If Chinese OEMs

26   used non-Qualcomm hardware, they would have to pay more than double the royalty that they would

27   pay if they used Qualcomm hardware. Qualcomm also gave Chinese OEMs favorable royalty rates

28

on sales within China if they committed to exclusively using Qualcomm hardware. Qualcomm publicly stated that:

> The royalty rates provided to certain Chinese manufacturers for products manufactured and sold in China for use in China are more favorable than our standard rates. However, in order to benefit from these more favorable rates in China, the Chinese manufacturer must provide substantial, additional value to QUALCOMM, including, among other things, (i) paying, for a period of time, a royalty on sales outside of China at a rate higher than our standard rate and (ii) committing to use QUALCOMM's ASICs in their worldwide sales of CDMA subscriber units and infrastructure.

103.    Qualcomm charged OEMs a royalty rate for its UMTS SEPs if OEMs purchased baseband processors from a Qualcomm competitor. But by contrast, Qualcomm allowed OEMs to net out the price of a Qualcomm baseband processor from the price of the cell phone for the purposes of calculating the royalty rate. This price netting was intended to harm competition in the market for UMTS baseband processors.

104.    Qualcomm threatened OEMs with a potential disruption in the supply of CDMA baseband processors unless customers also purchased Qualcomm's UMTS baseband processors. Qualcomm's threat was effective because Qualcomm had a monopoly over CDMA baseband processors, and OEMs could not produce CDMA-compliant cell phones without access to Qualcomm's baseband processors.

105.    Qualcomm demanded that licensees of Qualcomm's UMTS SEPs reveal confidential pricing information about UMTS baseband processors, including information about sales by Qualcomm's direct competitors. There is no legitimate business justification for this request.

106.    Qualcomm repeatedly threatened OEMs with meritless litigation if they purchased UMTS baseband processors from suppliers besides Qualcomm. Qualcomm also imposed non-disclosure agreements on all potential licensees who entered into negotiations. And Qualcomm even sued Texas Instruments in 2003 for violating a non-disclosure provision before ultimately dropping the lawsuit because it would otherwise have had to disclose the terms of other licensing terms in an open court proceeding.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**F.     Qualcomm Exploits Its Monopoly Power Over the Supply of CDMA and LTE Baseband Processors Through Artificial Supply Constraints that Force OEMS to Pay Qualcomm's Artificially Inflated Royalty Rates**

107.    Qualcomm has repeatedly exploited its monopolistic position in the CDMA and LTE baseband processor markets by artificially limiting the supply of CDMA baseband processors in order to suppress competition, lower output, and maintain monopolistic profits.

108.    Starting in 2001, Qualcomm used the threat of artificial shortages in the supply of CDMA baseband processors to discipline suppliers. Qualcomm threatened OEMs with the loss of various Qualcomm services if the manufacturers purchased baseband processors from Qualcomm competitors. A representative of a Korean device manufacturer was anonymously quoted in the Korea Times as saying, "A bigger problem is nobody can file a complaint to Qualcomm. Who would like to run the risk of being excluded from the customer list of Qualcomm, the monopolistic player?"

109.    On April 22, 2004, Qualcomm's President was quoted as describing a shortage of baseband processors as "very much a supply limited market" and stating that a wireless carrier had been "constrained by the number of phones they can get."

110.    As a monopoly supplier of CDMA and LTE baseband processors, Qualcomm has the market power to constrain supply at will.

111.    Qualcomm has continued to limit the supply of baseband processors in order to gain unfair leverage over OEMs in negotiations over patent licensing. Qualcomm refuses to enter into industry standard agreements that guarantee OEMs with a certain amount of baseband processors.

112.    Throughout 2012, there was a significant shortage in Qualcomm's supply of LTE baseband processors. This shortage increased Qualcomm's market power and allowed it to demand inflated royalty rates on its patent portfolio.

113.    In 2016, LG Electronics initiated arbitration against Qualcomm because of Qualcomm's unfair demands during patent licensing negotiations. Qualcomm and LG eventually reached a settlement in which Qualcomm agreed to increase its supply of baseband processors to LG.

### G. Qualcomm Has Resisted Efforts to Split QCT and QTL Because It Would Prevent Qualcomm From Continuing Its Anticompetitive Practices

114.     Qualcomm strongly fought the attempt of activist investors to split QCT, the baseband processor arm, and QTL, the patent licensing arm, into separate companies in 2015. These activist investors stated that Qualcomm was not being properly valued because the stock market was failing to properly assign value to the QCT division.

115.     Qualcomm, however, strongly rejected the activists' attempt to spinoff the QCT division because a split would jeopardize Qualcomm's ability to continue its anticompetitive practices. Qualcomm emphasized the important *synergies* that Qualcomm gained from keeping QCT and QTL as one corporate entity: "Our board of directors and management periodically review our corporate structure. Prior reviews have concluded that the synergies provided by our business model create more value for stockholders than could be created through alternative corporate structures."

116.     Qualcomm President Derek Aberle further warned investors who advocated a spinoff that "You have to step back and say why is that and would a separation actually solve whatever the underlying issues are that are creating the current valuation . . . . *You have to be careful that it's not too simplistic an analysis.*"[6] Reuters reported that Aberle said that Qualcomm's unified structure "*allowed Qualcomm to leverage relationships with Chinese customers*, since the chipmaker is well-positioned to help them expand to other countries. At the same time, Aberle acknowledged that having both a chips and licensing division has at times created conflicts with customers, 'but we manage it pretty well.'"

117.     Commentators recognized the tremendous leverage that Qualcomm gained from keeping QCT and QTL unified in one entity with one commentator noting that "if the proposed spin-off of Qualcomm's chip business had gone through, it could well have impacted [Qualcomm's] ability to leverage future patent negotiations on both sides of the businesses."[7]

---

[6] *Qualcomm President Says Splitting Company May Not Create Value*, Reuters (Sept. 3, 2015), http://www.reuters.com/article/us-qualcomm-president-idUSKCN0R32HL20150903 (last visited Jan. 24, 2017).

[7] *Why Qualcomm Has Ruled Against the Spin-Off of Its Chip Business in the Offing?*, Forbes (July 2, 2015), http://www.forbes.com/sites/greatspeculations/2015/07/02/why-qualcomm-has-ruled-against-the-spin-off-of-its-chip-business-in-the-offing/#52945abf1727 (last visited Jan. 24, 2017).

118. The FTC, in an almost completely redacted section of its complaint against Qualcomm, stated that Qualcomm "engaged in an intensive, high-level review of whether to divide Qualcomm's chip and licensing divisions into separate companies" but that Qualcomm's board decided in December 2015 not to break up the company.

119. Qualcomm publicly stated that it was rejecting the proposed separation in December 2015. Steve Mollenkopf, Qualcomm's CEO, stated that "the strategic benefits and synergies of our model *are not replicable* through alternative structures."

120. Qualcomm resisted spinning off QCT, despite the efforts of major activist investors, because it would have forced Qualcomm to cease many of the anticompetitive practices that have generated inflated royalty revenues on its patent portfolio.

**H. Governments Have Repeatedly Penalized Qualcomm for Its Anticompetitive Practices**

121. Qualcomm's anticompetitive practices have repeatedly been investigated and penalized by government regulators throughout the world.

122. In 2006, the Korean Fair Trade Commission began an investigation into Qualcomm's licensing practices. In 2009, the KFTC fined Qualcomm approximately $208 million. The KFTC concluded that Qualcomm engaged in three types of anticompetitive practices: 1) discriminatory patent licensing; 2) conditional rebating; 3) demanding post-patent term royalty payments. The KFTC found that Qualcomm had charged higher royalty rates to Korean OEMs who purchased CDMA baseband processors from Qualcomm's competitors through the use of three specific practices. First, Qualcomm charged a royalty rate of 5.75% for OEMs that used Qualcomm competitor processors but charged a discounted 5% royalty rate on OEMs that used Qualcomm baseband processors. Second, Qualcomm imposed a $30 overall royalty cap on each device that contained non-Qualcomm baseband processors but only a $20 cap on cellular devices with Qualcomm baseband processors. Third, Qualcomm allowed OEMs to deduct the price of Qualcomm baseband processors when calculating the per unit royalty rate but did not give the same discount for non-Qualcomm baseband processors. The KFTC concluded that Qualcomm's licensing practices were intended to restrain competition in the CDMA baseband processor market. The KFTC noted

1    that Qualcomm's own internal documents showed that Qualcomm's licensing program was intended

2    to drive competitors out of the CDMA chip market.

3          123.    In November 2006, the Japanese Fair Trade Commission ("JFTC") notified

4    Qualcomm that it was launching an investigation into Qualcomm's licensing and chip business

5    practices in Japan. On September 30, 2009, the JFTC issued a final order on Qualcomm's licensing

6    agreements with Japanese manufacturers. The JFTC stated that Qualcomm had forced Japanese

7    licensees to accept cross-license provisions without compensation, and to accept a provision under

8    which Japanese licensees agreed not to assert their SEPs against other licensees that had agreed to a

9    similar provision. The JFTC required Qualcomm to eliminate these provisions from its license

10   agreements with Japanese licensees.

11         124.    In November 2013, China's NRDC began an investigation into Qualcomm's patent

12   licensing practices. The NRDC fined Qualcomm $975 million in February 10, 2015. The NRDC

13   concluded that Qualcomm had (1) controlled both the baseband processor and licensing markets and

14   (2) used that monopolistic power to charge unfairly high royalties on licensees. The NRDC required

15   Qualcomm to reduce the wholesale basis cost for cellular devices to 65% of the overall wholesale

16   price when making royalty rate calculations.

17         125.    On December 8, 2015, the European Commission announced that it had reached the

18   preliminary conclusion that Qualcomm had violated EU antitrust rules with two separate sets of

19   actions. First, Qualcomm had illegally paid Apple to exclusively use Qualcomm chipsets and had

20   sold chipsets below their cost in order to force competitors out of the market. Second, between 2009

21   and 2011, Qualcomm had intentionally engaged in predatory pricing to drive Icera, a chipset

22   manufacturer competitor, out of the market by selling Qualcomm chipsets below cost to two major

23   customers.

24         126.    In December 2015, the Taiwanese Fair Trade Commission ("TFTC") requested

25   materials from Qualcomm as part of an investigation into Qualcomm's licensing practices.

26         127.    On December 28, 2016, the Korean Fair Trade Commission levied an $835 million

27   fine on Qualcomm for its anticompetitive licensing practices. The KFTC's fine came after an

28   extensive investigation that included numerous commission hearings and the review of documents

CLASS ACTION COMPLAINT
Case No.:                                    -27-
010669-11 931182 V1

provided by Samsung, LG, Apple, Qualcomm, Nvidia, Mediatek, Huawei, and Ericsson. The KFTC concluded that Qualcomm had used its supply of chipsets as leverage to force device manufacturers to pay excessive patent royalties. Qualcomm had also refused to license its SEPs to competing chipset manufacturers in violation of its FRAND commitments.

128.    The KFTC issued a remedial order to Qualcomm with three main substantive components: (1) Qualcomm must engage in good-faith negotiations for its SEPs in accordance with its FRAND commitments with other manufacturers of baseband processors; (2) Qualcomm should not use its supply of baseband processors as leverage when negotiating patent licensing terms with OEMs; (3) Qualcomm should negotiate FRAND terms for its SEPs with OEMs and should renegotiate existing license agreements if requested by OEMs.

129.    On January 17, 2017, the Federal Trade Commission filed an enforcement action in this court under Section 5 of the FTC Act based on Qualcomm's anticompetitive licensing practices. The FTC requested a permanent injunction against Qualcomm's unfair methods of competition. The FTC stated that Qualcomm had "engaged in exclusionary conduct that taxes its competitors' baseband processor sales, reduces competitors' ability and incentive to innovate, and raises prices paid by consumers for cell phones and tablets." The FTC stated that "OEMs likely pass some portion of these higher prices on to consumers in the form of higher device prices or reduced device features."

**I.    Market Definition**

130.    The relevant geographic market for purposes of this action is the United States and its territories.

131.    The relevant product markets are (1) CDMA and LTE compliant baseband processors ("baseband processor market") and (2) licensing rights for SEPs that are included in the 3G and 4G standards created by the SSOs (the "SEP licensing market").

132.    Qualcomm directly participates in the overall market for cellular devices because it manufactures baseband processors that are used in cellular devices and imposes licenses on all manufacturers of cellular devices regardless of whether or not they use Qualcomm baseband processors.

133.    Qualcomm's anticompetitive conduct causes direct injuries to consumers by inflating the cost of cellular devices through two, related mechanisms: (1) imposing excessive royalties on the licensing of SEPs used in wireless standards in in violation of Qualcomm's FRAND commitments; and (2) eliminating competition in the baseband processor market by refusing to license SEPs in violation of Qualcomm's FRAND commitments, which allows Qualcomm to charge excessive prices on its sale of baseband processors.

## VII.    EFFECTS OF QUALCOMM'S MISCONDUCT

### A.    The Inflated Prices for Qualcomm's SEPs and Baseband Processors Were Passed on to Consumers

134.    Qualcomm's monopolistic and anticompetitive behavior resulted in harm to Plaintiff and other members of the proposed Class because it caused them to pay higher prices for device products than they would have otherwise paid if not for Qualcomm's unfair business practices. The entire overcharge for the cellular devices was passed on to the members of the proposed class.

135.    Baseband processors are commodity products, which share standard specifications, in particular the ability to operate on various wireless standards. Baseband processors are incorporated into cellular devices, which are also commodity products. These devices share certain standard specifications.

136.    A consumer purchases a device as a stand-alone device. Qualcomm's baseband processors are clearly identifiable as incorporated into specific cellular devices. Qualcomm also receives a specified, inflated royalty rate on the sale of specific cellular devices. This royalty rate is clearly identifiable for specific device types.

137.    The indirect purchaser purchases cellular devices from one of two distribution chains: (1) a cell phone OEM; and (2) a reseller, such as a retailer or wireless network. Thus, Qualcomm's revenues from baseband processors and SEPs follow a traceable chain from Qualcomm to the consumer.

138.    The OEM and retail markets for cellular devices are subject to vigorous price competition. OEMs and retailers have thin net margins and are at the mercy of their component

1  costs. Increases in the price of baseband processors and the royalty rate for SEPs will lead to

2  corresponding price raises at the OEM and retailer levels for cellular devices.

3      139.    SEP royalty rates and baseband processors make up a substantial portion of the cost of

4  manufacturing cellular devices. The retail price of a device is determined in substantial part by the

5  cost of the baseband processors and of the associated SEPs.

6      140.    As a result, the inflated prices of cellular devices resulting from Qualcomm's

7  anticompetitive practices have been passed on to the plaintiff and other members of the proposed

8  class by direct-purchaser manufacturers, distributors, and retailers.

9      141.    Economic theory teaches that the only situations in which precisely zero pass through

10  occurs is when an industry faces a perfectly elastic demand for its product (i.e., the price was fixed,

11  with demand dropping to zero with an infinitesimal price increase, and expanding infinitely if price

12  were to drop infinitesimally), or if supply was perfectly inelastic (i.e., if even a very large increase in

13  price for a product was incapable of stimulating additional supply).[8] These possibilities are

14  considered implausible by economists. Either scenario is at odds with the nature of the device

15  industries. Existing empirical studies of the electronics industry have concluded that demand is ***not***

16  infinitely elastic. Therefore, at least a partial pass through of an increase in the costs of SEP licenses

17  and baseband processors into the price of cellular devices – and consequent harm to class members –

18  is the predicted outcome of a successful monopolistic behavior.

19      142.    To the extent that distributors, wholesalers, and retailers selling to consumers or to

20  others in the distribution chain price their sales as their cost plus a fixed markup, this will create an

21  additional reason for pass through to exceed 100 percent through these channels.[9] Further, because

22  retailers ultimately compete with direct sales to purchasers by device manufacturers, competitive

23  forces would likely work to equalize end-purchaser prices between channels, after controlling for the

24  _____

25  [8] The usual hypothesis that is commonly examined in empirical pass through studies is whether pass through exceeds, falls short of or equals 100 percent.

26  [9] For example, if a wholesaler prices its product at manufacturer sales price plus 10 percent, and a retailer prices its product at wholesale plus 10 percent, the total pass through to the final consumer will be 121 percent (i.e., 110 percent times 110 percent) of manufacturer sales price. Certain distributor costs, like the costs of holding inventory, and "shrinkage," may be approximately proportional to the value of the products held, and thus be one factor creating this pricing policy.

CLASS ACTION COMPLAINT
Case No.:                              -30-
010669-11 931182 V1

value of differences in support across different distribution channels. This would tend to push the total pass-through rate from costs to end-purchaser pricing above 100 percent, since manufacturers could not sustain a pricing policy to distributors that did not cover their costs, and an additional fixed markup on top of distributor cost would result in a total pass-through rate to final consumers in excess of 100 percent.

143.    Thus, the extent to which input cost increases are passed through into output prices is entirely an empirical issue, and it is an area in which methods of empirical analysis are well established. Based on both theory and the published studies in this area, it is likely that the pass-through rates of inflated costs on both baseband processors and SEP into cellular devices will exceed 100 percent, a situation known as "overshifting."

144.    In particular, it is undisputed that overshifting is possible in markets with many suppliers of differentiated products and easy entry and exit, an environment known as "monopolistic competition." Indeed, pass through in excess of 100 percent would actually be expected in industries where firms produce differentiated products in competitive conditions, and face economies of scale – that is, where their average cost of producing a product declines with their level of output. In particular, as noted next, in competitive industries with differentiated products and relatively easy entry and exit (monopolistic competition), when there are economies of scale, overshifting will be the rule, not the exception. Empirical studies by economists have characterized the personal computer industry as an industry which fits this description. For this reason, it is likely that pass through is greater than 100 percent, in the market conditions that prevail for most, if not all, types of mass market computer and consumer electronics equipment.

145.    Thus, plaintiff and other members of the proposed Class have been forced to pay supracompetitive prices for cellular devices. These inflated prices have been passed on to them by direct purchaser manufacturers, distributors, and retailers.

## VIII.   CLASS ACTION ALLEGATIONS

146.    Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on their own behalf and on behalf of the following class (the "Class") for claims arising under California law:

> All persons and entities residing in the United States who from January 24, 2013 through the present, purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA and/or LTE cellular devices ("relevant cellular devices") from January 24, 2013 through the present. This class excludes the Defendant; the officers, directors or employees of the Defendant; and any subsidiary, affiliate or other entity in which Defendant has a controlling interest. The Class also excludes all federal, state or local governmental entities, all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

147. In the event California law is not applied to the claims of all Class members for damages regardless of where they reside, plaintiff will seek certification of the following subclass ("Subclass") under Rule 23(b)(3) for damages, under the laws of the Included States (as defined below), in addition to certification of the Class under Rule 23(b)(2) for purposes of injunctive relief:

> All persons and entities residing in the United States who from January 24, 2013 through the present, purchased, paid and/or provided reimbursement for some or all of the purchase price for CDMA and/or LTE cellular devices ("relevant cellular devices") from January 24, 2013 through the present.  This class excludes the Defendant; the officers, directors or employees of the Defendant; and any subsidiary, affiliate or other entity in which Defendant has a controlling interest. The Class also excludes all federal, state or local governmental entities, all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

148. Plaintiff does not know the exact number of Class members but believe that the Class includes millions of members. Plaintiff believes that joinder of all Class members is impracticable. Fed. R. Civ. P. 23(a)(1).

149. Common questions of law and fact exist as to all members of the Class. Such questions of law and fact common to the Class include, but are not limited to, the following:

150. Whether Qualcomm possessed monopoly power in the CDMA and LTE baseband processor markets during the Class period.

151. Whether Qualcomm acquired or maintained monopoly power within the CDMA and LTE baseband processor markets through anticompetitive activity.

152. Whether Qualcomm possessed monopoly power in the SEP licensing market during the Class period.

153. Whether Qualcomm acquired or maintained monopoly power in the SEP licensing market through anticompetitive activity.

CLASS ACTION COMPLAINT
Case No.:                                          -32-
010669-11 931182 V1

154.    Whether Qualcomm tied the sale of CDMA and LTE baseband processors to the purchase of license rights to its patent portfolio, including its SEPs.

155.    Whether Qualcomm tied the sale of its SEPs to the purchase of non-SEPs that were also included in Qualcomm's patent portfolio.

156.    Whether Qualcomm's unlawful conduct enabled Qualcomm to increase, maintain, or stabilize above competitive levels the prices it charges for patent licenses and its CDMA and LTE baseband processors; if so, whether such supracompetitive prices were passed on to Class members; and, if so, the appropriate classwide measure of damages.

157.    Whether Qualcomm violated Section 2 of the Sherman Act.

158.    Whether Qualcomm violated Sections 16720 and 17200 of the California Business and Professions Code.

159.    Whether Qualcomm violated the antitrust, unfair competition, consumer protection laws, and unjust enrichment laws as alleged below.

160.    These common questions and others predominate over questions, if any, that affect only individual Class or Subclass members. Fed. R. Civ. P. 23(a)(2) and 23(b)(3).

161.    Plaintiff's claims are typical of, and not antagonistic to, the claims of the other Class members. By advancing their claims, plaintiff will also advance the claims of all Class members, because Qualcomm participated in activity that caused all Class members to suffer similar injuries. Fed. R. Civ. P. 23(a)(3).

162.    Plaintiff will fairly and adequately protect the interests of absent Class members. There are no material conflicts between plaintiff's claims and those of absent Class or Subclass members that would make class certification inappropriate. Counsels for plaintiff are experienced in complex class action litigation, including antitrust litigation, and will vigorously assert plaintiff's claims and those of absent Class members.  Fed. R. Civ. P. 23(a)(4).

163.    Qualcomm has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole. Fed. R. Civ. P. 23(b)(2).

164.    A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. Fed. R. Civ. P. 23(b)(3). The damages suffered by each plaintiff and Class member is relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for plaintiff and Class members to redress the wrongs done to them. Even if plaintiff and Class members could afford individual litigation, which is not the case, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

165.    Each of the foregoing allegations is incorporated in this claim for relief.

166.    The relevant product markets are the CDMA and LTE baseband processor markets and the SEP technology licensing market.

167.    The relevant geographic market is the world.

168.    Qualcomm possesses monopoly power in the CDMA and LTE baseband processor markets. Qualcomm has consistently held over a 90% share of the CDMA baseband processor market between 2001 and 2015. Qualcomm held shares of the LTE baseband processor market over 80% from 2012 to 2014. In 2015, Qualcomm had 83% of the CDMA market and 69% of the LTE market.

169.    LTE baseband processors are a necessary component of premium smartphones such as the Apple iPhone and the Samsung Galaxy because those devices are designed to function with carrier networks that require LTE compatibility, such as each of the major U.S. wireless networks. No other product, such as CDMA or UMTS baseband processors, are available as a substitute for

CLASS ACTION COMPLAINT
Case No.:                                    -34-
010669-11 931182 V1

1   LTE baseband processors and no other product constrains the price of LTE baseband processors at

2   levels below the monopoly price.

3        170.   CDMA baseband processors are a necessary component of devices that are intended

4   for use on carrier networks that require CDMA compatibility. No other product, including UMTS

5   and LTE baseband processors, are a substitute for CDMA baseband processors for devices intended

6   for use on networks that require CDMA compatibility. No other product constrains the price of

7   CDMA baseband processors at levels below the monopoly price.

8        171.   Since at least 2007, Qualcomm has engaged in a systematic pattern of anticompetitive

9   conduct designed to exclude competition from the baseband processor markets. Qualcomm's

10   FRAND commitments gave it monopoly power but Qualcomm's anticompetitive refusal to license

11   its SEPs on FRAND terms has successfully prevented competition in the CDMA and LTE baseband

12   processor markets. Qualcomm has also entered into exclusive dealing arrangements with OEMs,

13   such as Apple, that prevent competition from developing in the baseband processor markets. But for

14   Qualcomm's conduct, rival manufacturers would have become stronger competitors in the baseband

15   processor markets.

16        172.   Qualcomm's refusal to offer SEP licenses on FRAND terms to its competitors, as

17   alleged above, is an unlawful refusal to deal with competitors and an act of monopolization under

18   Section 2 of the Sherman Act. A FRAND license would give competing baseband processor

19   manufacturers the right to market authorized sales of baseband processors to OEMs. Qualcomm's

20   failure to license on FRAND terms eliminates the ability of OEMs to purchase baseband processors

21   from competing manufacturers. This, in turn, allows Qualcomm to demand inflated royalty rates

22   from OEMs for its SEPs. Qualcomm's refusal to offer a FRAND license to competitors is a key

23   causal component of its acquisition and maintenance of monopoly power in the CDMA and LTE

24   baseband processor markets.

25        173.   The standardization process eliminates other potential technological competitors to

26   the chosen standard. Once a standard is chosen, competing technologies are no longer available.

27   The standard setting process confers monopoly power on SEP owners because their technologies are

28   necessary to practice the standard. Qualcomm's FRAND commitments induced SSOs to incorporate

technologies covered by Qualcomm's declared-essential patents for the relevant standards, and therefore eliminated competition within the relevant SEP licensing market.

174.    There is no procompetitive justification for Qualcomm's refusal to license its SEPs to competitor manufacturers. This action undermines the FRAND terms that are necessary to ensure that technical standards are not abused by monopolists who are granted market power solely from the lock in that occurs after a standard is formulated.

175.    Qualcomm possesses monopoly power in the SEP licensing market because OEMs and competitor manufacturers need licenses to Qualcomm's SEPs in order to make and sell products and services that utilize the wireless standards. Once a wireless standard is agreed upon, a company is locked into that standard if it wants to sell products and services based on that standard.

176.    Qualcomm ties licenses to its SEPs to purchases of baseband processors despite the fact that OEMs would prefer to purchase these products on an unbundled basis. Qualcomm's actions foreclose substantial portions of the baseband processor markets to Qualcomm's competitors. Qualcomm's "no chips no license" policy further contributes to its creation and maintenance of monopoly power.

177.    There is no procompetitive justification for demanding that OEMs purchase a bundled version of both Qualcomm's chips and licenses. Instead, every other cell phone component manufacturer conveys their intellectual property rights with the sale of the products embodying that intellectual property. That approach is, in fact, mandated by the doctrine of patent exhaustion.

178.    Qualcomm maintained its monopoly power in the SEP licensing market through the anticompetitive practice of contractual agreements with OEMs, such as Apple, that prevented them from judicially challenging Qualcomm's refusal to offer FRAND terms. These contractual commitments ensured that Qualcomm could continue to charge supracompetitive royalty rates for its SEPs without the risk of judicial scrutiny. Qualcomm was able to insert such terms into its licensing agreements because it possessed monopoly power in the CDMA and LTE baseband processor markets – OEMs had to agree to these anticompetitive licensing terms or risk losing access to Qualcomm's supply of CDMA and LTE baseband processors.

179.     Qualcomm has attempted to maintain its monopoly power by withholding royalty payments from OEMs, such as Apple, that have cooperated with ongoing investigations by government regulators into Qualcomm's anticompetitive business practices. There is no procompetitive justification for attempting to prevent the application of antitrust law to Qualcomm's unlawful behavior.

180.     Substantial barriers to entry and expansion exist in the relevant markets.

181.     Qualcomm has the power to control prices and exclude competition in the relevant markets.

182.     Since before January 1, 2008, Qualcomm has engaged in conduct with anticompetitive effects to: (a) unlawfully maintain and enhance its monopoly in the relevant markets and to keep prices high; and (b) stifle competition and eliminate consumer choice through unlawful exclusionary behavior designed to prevent other competitors and potential competitors weak, undersized, and unable to achieve a minimum efficient scale of operation needed to offer a viable substitute for Qualcomm's CDMA and LTE baseband processors.

183.     There is no legitimate business justification for Qualcomm's conduct.

184.     Qualcomm has charged supracompetitive prices for its CDMA and LTE baseband processors as well as licensing rights for its patent portfolio.

185.     Plaintiff and other members of the Class have been injured and will continue to be injured in their businesses and property by paying more for baseband processors and associated patent licensing rights purchased indirectly from Qualcomm than they would have paid and would pay in the future in the absence of Qualcomm's unlawful acts, including paying more for cell phones and tablets in which baseband processors are a component, as a result of higher prices paid for baseband processors and patent licenses by the manufacturers of those products.

186.     Plaintiff and other members of the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

<u>SECOND CLAIM FOR RELIEF</u>

**(Violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16720)**

187.     Each of the foregoing allegations is incorporated in this claim for relief.

CLASS ACTION COMPLAINT
Case No.:                                                 -37-
010669-11 931182 V1

188.    Qualcomm's contracts, trusts or conspiracies were entered into, carried out, effectuated and perfected mainly within the State of California, and Qualcomm's conduct within California injured all Class members throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all Class members, whether or not they are California residents.

189.    Beginning at a time presently unknown to plaintiff, but at least as early as June 28, 2008, and continuing to today, Qualcomm and its co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Through agreements with its customers and with standards-setting bodies as alleged herein, Qualcomm conspired in violation of Section 16720 to maintain monopoly power in the relevant markets and to set prices for baseband processors and SEPs at supracompetitive levels.

190.    For the purpose of forming and effectuating the unlawful contracts, trusts or conspiracies, Qualcomm has done those things that it combined and conspired to do as alleged in this Complaint, including but in no way limited to the following:

    a.    entering into exclusive and near-exclusive deals with OEMs;

    b.    pressuring OEMs to agree not to support product launches of Qualcomm's competitors;

    c.    entering into exclusive and near-exclusive deals with distributors; and

    d.    entering into exclusive and near-exclusive deals with retailers.

191.    The contracts, trusts or conspiracies alleged herein have had, *inter alia*, the following effects:

    a.    price competition in the sale of baseband processors has been restrained, suppressed and/or eliminated in the State of California and throughout the United States;

    b.    prices for baseband processors sold by Qualcomm and its co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California and throughout the United States; and

CLASS ACTION COMPLAINT
Case No.:
010669-11 931182 V1                                    -38-

1          c.      prices for patent licenses have been fixed, raised, maintained and stabilized at

2   artificially high, non-competitive levels in the State of California and throughout the United States;

3   and

4          d.      those who purchased baseband processors from Qualcomm have been

5   deprived of the benefit of free and open competition.

6          192.    Plaintiff and the Class members paid and continue to pay supracompetitive,

7   artificially inflated prices for cellular phones and tablets.

8          193.    As a direct and proximate result of Qualcomm's unlawful conduct, plaintiff and the

9   Class members have been injured in their businesses and property in that they paid more for

10  Qualcomm's baseband processors (or for products containing such baseband processors) and patent

11  licenses than they would have paid absent Qualcomm's unlawful conduct. As a result of

12  Qualcomm's violation of Section 16720, plaintiff and the Class members seek treble damages and

13  the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California

14  Business and Professions Code.

15                            THIRD CLAIM FOR RELIEF

16              (Violation of California's Tort Law Against Monopolization)

17         194.    Each of the foregoing allegations is incorporated in this claim for relief.

18         195.    By virtue of the conduct described above, Qualcomm has engaged in tortious and

19  unlawful monopolization of the CDMA and LTE baseband processor markets and the market for

20  SEPs.

21         196.    Qualcomm's conduct gives rise to a cause of action for common law monopoly under

22  California law on behalf of plaintiff and the Class members.

23         197.    As a direct and proximate result of Qualcomm's unlawful acts of monopolization,

24  plaintiff and the Class members have suffered actual damages in an amount to be proven at trial.

25         198.    Qualcomm's acts of monopolization were intended to monopolize and suppress

26  competition in the relevant market and to injure consumers. Qualcomm's acts include acts of fraud,

27  malice and oppression and were and are taken with conscious disregard for the rights of consumers,

28  including plaintiff and the Class members.  Accordingly, an award of punitive damages is justified in

CLASS ACTION COMPLAINT
Case No.:                              -39-
010669-11 931182 V1

1    order to make an example of Qualcomm, to punish it, and to deter it and others from engaging in the

2    same or similar conduct.  Plaintiff and the Class members seek an award of punitive damages in an

3    amount according to proof at trial.

4                                    FOURTH CLAIM FOR RELIEF

5                        **(Violation of the California Unfair Competition Law,**
                         **Cal. Bus. & Prof. Code § 17200 et seq.)**

6    199.    Each of the foregoing allegations is incorporated in this claim for relief.

7    200.    Qualcomm's business acts and practices were centered in, carried out, effectuated and

8    perfected mainly within the State of California, and Qualcomm's conduct within California injured

9    all Class members throughout the United States. Therefore, this claim for relief under California law

10   is brought on behalf of all Class members, whether or not they are California residents.

11   201.    Beginning on a date unknown to plaintiff, but at least as early as January 1, 2008 and

12   continuing to the present, Qualcomm committed and continue to commit acts of unfair competition,

13   as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging

14   in the acts and practices specified above.

15   202.    This claim is instituted pursuant to Sections 17203 and 17204 of the California

16   Business and Professions Code, to obtain restitution from Qualcomm for acts that violated Section

17   17200 of the California Business and Professions Code, commonly known as the Unfair Competition

18   Law ("UCL").

19   203.    Qualcomm's conduct as alleged in this Complaint constitutes unfair, unlawful and/or

20   fraudulent practices within the meaning of the Unfair Competition Law, including but not limited to

21   the following:

22           a.    Qualcomm violated the UCL by means of its violations of Section 2 of the

23   Sherman Act, as set forth above;

24           b.    Qualcomm violated the UCL by means of its violations of Section 16720, *et*

25   *seq.*, of the California Business and Professions Code, as set forth above; and

26

27

28

CLASS ACTION COMPLAINT
Case No.:                                        -40-
010669-11 931182 V1

c.     Qualcomm's acts and practices are unfair to consumers of baseband processors and SEP licenses in the State of California and throughout the United States within the meaning of the UCL.

204.    Plaintiff and Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Qualcomm as a result of such business acts or practices.

205.    Qualcomm's illegal conduct is continuing, and there is no indication that it will not continue such activity in the future.

206.    Qualcomm's unlawful and unfair business practices have caused and continue to cause plaintiff and the Class members to pay supracompetitive and artificially-inflated prices for baseband processors (or products containing baseband processors) and licenses to Qualcomm's SEPs.  Plaintiff and the Class members suffered injury in fact and lost money or property as a result of the unfair competition.

207.    As alleged in this Complaint, Qualcomm has been unjustly enriched as a result of its wrongful conduct and by its unfair competition. Plaintiff and Class members are accordingly entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits obtained by Qualcomm as a result of such business practices, pursuant to the California Business and Professions Code §§ 17203 and 17204.

<u>FIFTH CLAIM FOR RELIEF</u>

**(Unjust Enrichment and Disgorgement of Profits)**

208.    Each of the foregoing allegations is incorporated in this claim for relief.

209.    Qualcomm has been unjustly enriched through overpayments by plaintiff and Class members and the resulting profits.

210.    Under common law principles of unjust enrichment, Qualcomm should not be permitted to retain the benefits conferred via overpayments by plaintiff and Class members for Qualcomm's baseband processors (or for products containing such baseband processors) and for licenses to Qualcomm's SEPs.

CLASS ACTION COMPLAINT
Case No.:                                                   -41-
010669-11 931182 V1

211.     This claim is brought under California law on behalf of all Class members. In the event the Court does not apply California law to this claim on a nationwide basis, this claim is brought on behalf of all Class members based on the laws of the individual States and the District of Columbia.

212.     Plaintiff seeks disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which plaintiff and the Class members may seek restitution.

## X.      DEMAND FOR TRIAL BY JURY

213.     Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands trial by jury of all issues so triable under the law.

## XI.      PRAYER FOR RELIEF

WHEREFORE, plaintiff prays:

A.      That Qualcomm's conduct alleged herein be adjudged and decreed to violate the laws alleged in this Complaint.

B.      That plaintiff and the Class members recover damages, as provided by the state laws alleged in this Complaint, and that a joint and several judgment in favor of plaintiff and the Class be entered against Qualcomm in the maximum amount permitted by such laws;

C.      That Qualcomm, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing its anticompetitive conduct or adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      That plaintiff and Class members be awarded restitution, including disgorgement of profits obtained by Qualcomm as a result of its acts of unfair competition and unjust enrichment.

E.      That plaintiff and Class members be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

1

       F.       That plaintiff and Class members recover their costs of this suit, including reasonable

2

attorneys' fees as provided by law.

3

DATED: January 24, 2017              HAGENS BERMAN SOBOL SHAPIRO LLP

4

                            By     s/ Jeff D. Friedman

5

                                 JEFF D. FRIEDMAN

6

                            Shana E. Scarlett (217895)
                            715 Hearst Avenue, Suite 202

7

                            Berkeley, CA 94710
                            Telephone: (510) 725-3000

8

                            Facsimile: (510) 725-3001
                            jefff@hbsslaw.com

9

                            shanas@hbsslaw.com

10

                            Steve W. Berman
                            HAGENS BERMAN SOBOL SHAPIRO LLP

11

                            1918 Eighth Avenue, Suite 3300
                            Seattle, WA 98101

12

                            Telephone: (206) 623-7292
                            Facsimile: (206) 623-0594

13

                            steve@hbsslaw.com

14

                            Mark Robinson (054426)
                            ROBINSON CALCAGINE, INC.

15

                            19 Corporate Plaza Drive
                            Newport Beach, California 92660

16

                            Telephone: (949) 720-1288
                            Facsimile: (949) 720-1292

17

                            *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

26

27

28